# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SIMON OGUS, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | C.A. No. 2018-0869-LWW |
| SPORTTECHIE, INC., TAYLOR BLOOM, FRANCESCA BODIE, DANIEL KAUFMAN, and OAK VIEW GROUP, LLC, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: December 15, 2022
Date Decided: April 3, 2023

Ryan M. Ernst & David M. Klauder, BIELLI & KLAUDER, LLC, Wilmington, Delaware; Charles J. Hecht, CHARLES HECHT P.C., New York, New York; *Counsel for Plaintiff Simon Ogus*

Michael C. Heyden, Jr. & Joseph E. Brenner, GORDON REES SCULLY MANSUKHANI LLP, Wilmington, Delaware; *Counsel for Defendants Taylor Bloom and Daniel Kaufman*

Samuel T. Hirzel, II & Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Sarah Lightdale & Christopher L. Martin, Jr., COOLEY LLP, New York, New York; *Counsel for Defendants Francesca Bodie and Oak View Group, LLC*

**WILL, Vice Chancellor**

In 2012, plaintiff Simon Ogus cofounded SportTechie—a website covering sports technology news. The company began as a hobby for Ogus and defendant Taylor Bloom, who volunteered as a writer. Eventually, it began to take shape as a viable media platform.

First Bloom, and then Ogus, quit their other jobs to focus on developing SportTechie. They formalized the business by forming a limited liability company, with Bloom a 55.5% member, and Ogus a 45.5% member and the sole manager. They hired defendant Daniel Kaufman to assist with managing the business and to provide in-house legal advice. They obtained the support of Vintage Capital Investments, LLC and defendant Oak View Group, LLC, which offered financial investments in exchange for influence in the business and a stake in its success.

With SportTechie's growth, however, came challenges—particularly for Ogus. Ogus's interest in the business was significant and secure while SportTechie was a limited liability company. That changed between late 2016 and early 2017 when Ogus endorsed several key decisions, with the encouragement of Bloom and Kaufman. Ogus signed documents converting SportTechie from a limited liability company to a Delaware corporation. He agreed to appoint three members to a board of directors—Bloom, a Vintage representative, and defendant Francesca Leiweke-Bodie as Oak View Group's designee—but not himself. And he executed a

stockholders agreement that gave SportTechie the right to repurchase Ogus's 44.5% equity interest if he were terminated for any reason.

In March 2017, Bloom—SportTechie's Chief Executive Officer—recommended that the board fire Ogus for poor performance. Bloom and Bodie, representing a quorum of the board, signed a written consent removing Ogus as an officer and authorizing the termination of his employment. Two months later, Bloom caused SportTechie to exercise its option in the stockholders agreement to repurchase Ogus's stock. An outside firm subsequently arrived at a valuation for Ogus's equity.

Ogus then sued SportTechie, Bloom, Kaufman, Bodie, and Oak View Group in this court. In January 2020, Chancellor Bouchard dismissed several of Ogus's claims, including fiduciary duty and fraud claims challenging the repurchase under the stockholders agreement. Several narrowed claims survived, including a fraud claim, breach of fiduciary duty claims, an aiding and abetting claim, and a civil conspiracy claim. After two years of discovery, the defendants moved for summary judgment on the remaining claims against them.

For the reasons explained below, Bodie and Oak View Group's motion for summary judgment is granted. The record demonstrates that these defendants had limited, tangential, and ultimately innocuous roles in the relevant events. Bodie's decision to sign the written consent terminating Ogus is protected by the business

2

judgment rule, and there is no evidence indicating that she acted in bad faith or out of self-interest.  With no underlying breach of fiduciary duty claim, the aiding and abetting claim against Oak View Group and the civil conspiracy claim against Oak View Group and Bodie necessarily fail.

As to Bloom and Kaufman, however, questions of material fact remain that prevent summary judgment on the fraud, breach of fiduciary duty, and civil conspiracy claims pending against them.   Their motion is therefore denied.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, the facts described in this section are drawn from the Second Amended Verified Complaint (the "Complaint") for uncontested background facts and from the factual record as appropriate.[1]

---

[1] Second Am. Verified Compl. (Dkt. 172) ("Second Am. Compl.").  Citations in the form "PX __" refer to exhibits to the Affidavit of Simon Ogus in Support of Plaintiff's Opposition to Defendants' Motions for Summary Judgment (Dkt. 283) and the Amended Transmittal Affidavit of Ryan M. Ernst in Support of Plaintiff Simon Ogus's Answering Brief in Opposition to the Defendants' Motions for Summary Judgment (Dkt. 281). Citations in the form "DX __" refer to exhibits to the Transmittal Affidavit of Elizabeth A. DeFelice in Support of Defendants Francesca Bodie and Oak View Group, LLC's Motion for Summary Judgment (Dkts. 236-37).  Defendants Bloom and Kaufman adopt the exhibits set forth in the DeFelice affidavit. *See* Defs.' Taylor Bloom and Daniel Kaufman's Opening Br. in Supp. of Their Mot. for Summ. J. (Dkt. 240) 3 n.1.  Bloom and Kaufman provided additional exhibits also cited as "DX __."  Citations to DX 38 through DX 63 refer to exhibits to the Transmittal Affidavit of Joseph E. Brenner in Support of Defendants' Taylor Bloom and Daniel Kaufman's Motion for Summary Judgment (Dkt. 240).  Deposition transcripts are cited as "[Deponent's Last Name] Dep. Tr. __."  Where an exhibit lacks internal pagination, pin citations will reflect the last three digits of the exhibit's Bates stamp.

## A.    SportTechie's Formation and Growth

In early 2012, Simon Ogus and Josh Folk began publishing content relating to the intersection of sports and technology on a website called SportTechie.[2]  Ogus and Folk pursued this project as a hobby.  Shortly after the website's launch, Taylor Bloom—then a college student—began writing articles for SportTechie on a volunteer basis.[3]

In August 2013, SportTechie LLC was formed as a District of Columbia entity.[4]  Its members were Ogus, Folk, and Bloom.[5]

Ogus and Folk decided to give Bloom an ownership interest in SportTechie LLC because he "was contributing substantial time" to the business.[6]  Folk left the company by mid-2015, selling his interest to Ogus and Bloom.[7]  That summer, Bloom turned his focus to SportTechie full time.[8]

---

[2] Second Am. Comp. ¶ 23; *see* PX 7 ("Ogus Dep. Tr.") 16-17; 20-21.

[3] Second Am. Compl. ¶ 24; *see* Ogus Dep. Tr. 58.

[4] Second Am. Comp. ¶ 25; Defs. Taylor Bloom and Daniel Kaufman's Answer and Affirmative Defs. to Pl.'s Second Am. Compl. (Dkt. 179) ("Bloom & Kaufman Answer") ¶ 25.

[5] Bloom & Kaufman Answer ¶ 25.

[6] Second Am. Comp. ¶ 25; Bloom & Kaufman Answer ¶ 25.

[7] *See* Ogus Dep. Tr. 17-18; Second Am. Comp. ¶ 25; Bloom & Kaufman Answer ¶ 25.

[8] *See* DX 2; PX 5 ("Bloom Dep. Tr.") 15.

SportTechie LLC was formed as a Delaware entity in October 2015.[9] Two months later, Ogus joined Bloom in working full time for the company.[10] Bloom served as SportTechie's Chief Executive Officer and Ogus was its Chief Operating Officer.[11]

On February 7, 2016, Ogus and Bloom executed a limited liability company agreement to govern SportTechie LLC's internal affairs (the "LLC Agreement").[12] Ogus and Bloom were the only members of the company.[13] The LLC Agreement allocated a 55.5% membership interest to Bloom and the remaining 44.5% membership interest to Ogus.[14] Each member had a right to block "Major Decisions" by the Company, which required "the approval of all the Members."[15] Ogus was deemed SportTechie LLC's sole manager.[16]

---

[9] DX 4.

[10] Ogus Dep. Tr. 29.

[11] *Id.* at 61; *see* PX 6 ("Kaufman Dep. Tr.") 21.

[12] DX 6 ("LLC Agreement").

[13] *Id.* § 3.1 & Ex. A.

[14] *Id.* Ex. A; *see* Kaufman Dep. Tr. 21.

[15] LLC Agreement § 6.5(A)-(P) (defining "Major Decisions" to include "incurring any debt," "merging, consolidating, dissolving or terminating the Company," "amending or modifying the Articles or th[e LLC] Agreement," and "admitting any new Member or transferring any Member's Interest").

[16] *Id.* § 6.1.

5

That summer, SportTechie hired several new employees.[17] One was Daniel Kaufman, who was hired as "managing director" in July 2016.[18] Kaufman performed various "business tasks" for SportTechie and served as its in-house counsel.[19]

## B. SportTechie's Capital Raise

SportTechie's capital needs grew with its business. In the summer of 2016, SportTechie began discussions with Vintage Capital Investments, LLC and defendant Oak View Group, LLC about potential investments in SportTechie.[20] Vintage is an investment vehicle affiliated with startup investor Kai Sato.[21] Oak View Group is a sports entertainment and investment company.[22] Bloom acted on behalf of SportTechie in leading talks with Vintage and Oak View Group.[23]

On or about August 8, 2016, SportTechie and Vintage entered into a promissory note purchase agreement under which Vintage agreed to lend SportTechie $75,000 in exchange for a secured promissory note for the same

---

[17] Ogus Dep. Tr. 63-64.

[18] *Id.* at 73; *see* Kaufman Dep. Tr. 21-22.

[19] Ogus Dep. Tr. 73, 81; *see* Kaufman Dep. Tr. 22.

[20] *See* Bloom Dep. Tr. 174; Ogus Dep. Tr. 84-87.

[21] PX 10 ("Sato Dep. Tr.") 15-16.

[22] PX 4 ("Bodie Dep. Tr.") 12.

[23] Ogus Dep. Tr. 89-91, 180; *see* Bloom Dep. Tr. 206-07; DX 9.

amount.[24]   The note purchase agreement contemplated that additional investors would purchase promissory notes, with a maximum aggregate note issuance of $750,000.[25]  In the following days, Bloom, Kaufman, and Ogus discussed amending the LLC Agreement to add a three-member board of directors composed of Sato, Bloom, "and a third party."[26]   Meanwhile, Sato sent an introductory email connecting Bloom with defendant Francesca Bodie—then a Vice President of Business Development (now President of Business Development) at Oak View Group.[27]

Negotiations between SportTechie and Oak View Group—through Bloom and Bodie—resulted in an October 21, 2016 Secured Convertible Promissory Note Agreement.[28]  Oak View Group agreed to lend SportTechie $675,000 in exchange for a secured promissory note for the same amount.[29]  Oak View Group was provided

---

[24] DX 10.

[25] *Id.* at Recital.

[26] DX 11.

[27] *See* PX 13; Bodie Dep. Tr. 12-14, 20.

[28] DX 12 ("OVG Note").

[29] The promissory note had a conversion feature.  OVG Note at -789.  In the event of a qualified financing, the outstanding principal balance of the note would automatically convert into limited liability company interests or other applicable equity securities at a set conversion price. *Id.* at -789-90.  The note was never converted. *See* Bloom Dep. Tr. 331.

7

the right to appoint a director to SportTechie's nascent board, as well as information and other rights.[30]

## C.    SportTechie's Conversion

Starting in August 2016 and continuing into the following months, Ogus, Bloom, and Kaufman began to consider converting SportTechie LLC into a Delaware corporation.[31]  Bodie and Oak View Group were not involved in these discussions.[32]  Around this time, Bloom and Kaufman began contemplating who might sit on an eventual board of directors.[33]

The LLC Agreement required Ogus's consent to the conversion.[34]  Despite that, his role in drafting the conversion paperwork was limited.[35]  Ogus did, however, engage in discussions with Kaufman and Bloom about the composition of the post-conversion board of directors.[36]  For example, on November 1, 2016, Ogus expressed concern about being "exposed" if the board were composed of "Kai [Sato], Taylor [Bloom] and [an] OVG seat."[37]  Kaufman assured Ogus that "major

---

[30] OVG Note § 5.2; *see also* PX 25.

[31] *See* Kaufman Dep. Tr. 160; Ogus Dep. Tr. 129; PX 29.

[32] *See* Kaufman Dep. Tr. 160-61; Bodie Dep. Tr. 77-78; *see also* Ogus Dep. Tr. 348-49.

[33] *See* Bloom Dep. Tr. 279; DX 43 at -427.

[34] LLC Agreement §§ 6.2, 6.5.

[35] *See* Second Am. Compl. ¶ 50; Bloom & Kaufman Answer ¶ 50.

[36] *See* DX 45 at -005.

[37] PX 32 at -428.

corporate decision[s]" would require "a vote of the shareholders" and that Ogus would "have the ability" to contract for certain rights in a stockholders agreement.[38] Bloom agreed with Kaufman, telling Ogus that such an agreement would allow for control to shift "away from the board and to the shareholders."[39] Ogus insisted that he "want[ed] the board as well" but also "want[ed] to maintain [a] grip on things."[40]

On December 29, 2016, Kaufman sent Ogus the conversion documents.[41] Kaufman wrote, "[t]hese are basic filings with the state of Delaware to effectuate the conversion. They need to be filed [] by 2:30 pm eastern tomorrow. Take a look and then let's plan to talk."[42] Ogus signed the documents.[43]

On December 30, 2016, SportTechie LLC filed with the Delaware Secretary of State a certificate of conversion pursuant to Section 265 of the Delaware General Corporation Law.[44] The conversion certificate provided that SportTechie would convert from a limited liability company to a corporation on December 31, 2016 at

---

[38] *Id.* at -427.

[39] *Id.*

[40] *Id.*

[41] PX 34 at -039.

[42] *Id.*

[43] Second Am. Compl. ¶ 53; Bloom & Kaufman Answer ¶ 53.

[44] DX 3 at -018.

11:59 p.m.[45] The certificate also stated that SportTechie LLC would change its name to SportTechie, Inc. ("SportTechie") upon the conversion.[46]

Concurrently with the filing of the certificate of conversion, SportTechie filed a certificate of incorporation with the Delaware Secretary of State.[47] SportTechie's certificate of incorporation does not expressly limit the ability of the board of directors (the "Board") to manage the business and affairs of the corporation— including the Board's authority to hire and fire officers. The certificate of incorporation also exculpates SportTechie's directors from personal liability for monetary damages for breaches of fiduciary duty "[t]o the fullest extent permitted by law."[48]

Just before midnight on December 31, Ogus and Bloom signed a written consent in lieu of a special meeting of SportTechie's stockholders that appointed Bloom as the sole member of the Board.[49]

Bloom then signed a written consent electing himself as President and Chief Executive Officer, Ogus as Vice President, and Kaufman as Secretary and

---

[45] *Id.*

[46] *Id.*

[47] *Id.* at -020–025.

[48] *Id.* at Art. IX.

[49] DX 13 ("Whereas, the Bylaws provide that the Board shall have no less than one director and no more than five directors. Initially there shall be one director.").

Treasurer.[50]  Bloom also caused SportTechie to issue shares of common stock consistent with the ownership of SportTechie LLC: 3,052,500 shares of SportTechie's common stock were issued to Bloom (55.5% of the outstanding issued shares) and 2,447,500 shares were issued to Ogus (44.5% of the outstanding issued shares).[51]

By the same written consent, Bloom adopted SportTechie's bylaws.[52]  The bylaws, effective as of December 31 at 11:59 p.m., provided that "[a]ny officer or agent elected or appointed by the Board of Directors may be removed by the Board of Directors whenever in its judgment the best interests of the Corporation would be served thereby."[53]

### D.      The Shareholders Agreement and Written Consent

On January 31, 2017, Kaufman sent Bloom and Ogus a Shareholders Agreement.[54]   After discussion, Bloom and Ogus signed the Shareholders Agreement on February 1.[55]

---

[50] DX 14 at -676.

[51] *Id.* at -677.

[52] *Id.* at -676.

[53] DX 15 § 4.3.

[54] DX 50.

[55] *See* DX 16 ("Shareholders Agreement").

The Shareholders Agreement included a provision setting forth SportTechie's rights in the event that the employment of a "Founder"—defined as Ogus or Bloom—was terminated.[56] Under Section 6 of the Shareholders Agreement, SportTechie had the right to repurchase the common stock of a Founder whose employment was terminated "for any reason or for no reason."[57] Section 6.1 states:

> Upon the termination of a Founder's employment from the Company . . . (for any reason or for no reason), then the Company shall have the right and option, but not the obligation (the "Company Option") . . . to purchase all or a portion of the Common Stock held by such Founder . . . .[58]

Section 6.2 sets out the method for determining the repurchase price for a Founder's shares of common stock:

> The purchase price for the Common Stock purchased pursuant to this Section 6 shall be an amount equal to the fair market value (as determined in good faith by the Board) of the Shares sold pursuant to the Company's exercise of the Company Option; *provided, however*, that in the event that the Company Option is exercised as a result of the Company's termination of such Founder's employment for Cause, the purchase price for the Common Stock purchased pursuant to this Section 6 shall be equal to 50% of the fair market value of the Shares (as determined in good faith by the Board) sold pursuant to the Company's exercise of the Company Option.[59]

---

[56] *Id.* § 1.

[57] *Id.* § 6.1.

[58] *Id.*

[59] *Id.* § 6.2 (emphasis in original). The Shareholders Agreement further provided that, in the event of a repurchase pursuant to Section 6.1, SportTechie could pay up to 90% of the consideration by promissory note. *Id.* § 6.3.

Section 6.4(e) "appoint[ed] [SportTechie]" as "attorney-in-fact . . . to effectuate the purchase and sale of such Shareholder's Common Stock" under Section 6.[60]

Kaufman also sent Bloom and Ogus a draft written consent in lieu of a special meeting of stockholders that appointed Bodie and Sato to the Board.[61] Bloom and Ogus each signed the written consent, which was effective as of February 1. The written consent stated that it was "desirable and in the best interests of [SportTechie] in order to fulfill its business purposes to appoint additional directors to serve as members of the Board."[62] The written consent provided that "the Board shall have no less than one (1) director and no more than five (5) directors."[63] From February 1 through the date of Ogus's termination, there were three Board members: Bloom, Sato, and Bodie.

Separately, Kaufman executed a Restricted Stock Purchase Agreement providing that he would receive shares of SportTechie common stock based on his continued employment.[64]

---

[60] *Id.* § 6.4(e).

[61] DX 50.

[62] DX 17.

[63] *Id.*

[64] DX 53; *see* DX 54.

## E. Ogus's Termination and Removal

In mid-February 2017, Bloom spoke to Kaufman and Sato about Bloom's intention to terminate Ogus.[65] On February 23, Kaufman and Bloom retained a valuation firm called Derivatas, LLC to determine the enterprise value of SportTechie to facilitate the repurchase of Ogus's shares.[66]

On March 1, Bloom wrote to Bodie that he had a few matters that he "wanted to touch base on."[67] Bloom said that his "top priority" was to "remov[e] [Ogus] from SportTechie altogether" because Ogus "ha[d] failed to scale with SportTechie's growing needs and ha[d] become an unreliable team member."[68] Bodie told Bloom that she was "totally supportive of [Bloom's] judgment" and supported his decision to terminate Ogus.[69]

On March 7, Bloom and Bodie—a quorum of the Board—executed a written consent to a resolution removing Ogus as an officer of SportTechie as of March 8,

---

[65] *See* DX 18 at -105 ("Spoke with [Kaufman] last night about my decision to remove [Ogus] from [SportTechie]. The first words out of his mouth after I laid out my reasoning: 'This is the right move.' He was in total agreement and said he knew this would have to happen at some point. We are speaking with our lawyer this week to move the process along.").

[66] DX 20; Kaufman Dep. Tr. 164.

[67] DX 21.

[68] *Id.*; *see* Bloom Dep. Tr. 534-35.

[69] DX 21; *see* Bodie Dep. Tr. 114.

14

2017 at 11:59 p.m.[70]  The written consent authorized Bloom and his designees to "take such further action necessary to effectuate the intent of th[e] resolution."[71]

On March 8, Derivatas emailed Bloom and Kaufman a "final copy" of a Restricted Appraisal Report.[72]  The cover letter to the Restricted Appraisal Report explained that Derivatas had performed a valuation of SportTechie's total equity value on a non-controlling, non-marketable basis as of February 24, 2017.[73]  The report concluded that the estimated range of market value of SportTechie's equity was $2.2 million to $2.6 million.[74]

On March 9, Bloom and Kaufman met Ogus at a coffee shop to inform him that his employment was terminated.  Ogus was handed a letter signed by Bloom that said: "As you know, the Board has elected to remove you as an officer effective at 11:59 pm on March 8, 2017.  I've enclosed a copy of the official Board Consent for your reference.  Pursuant to the Board's instructions, I am also hereby terminating your employment, effective immediately."[75]  The letter noted that

---

[70] DX 22.

[71] *Id.*

[72] DX 23.

[73] *Id.* at -399.  The letter from Derivatas explained that the valuation was "performed solely to assist Taylor Bloom and Daniel Kaufman ('Clients' or 'Company') for corporate planning purposes related to the potential buyout of certain minority interest currently held by Mr. Simon Ogus, Co-Founder and COO of the Company."  *Id.*

[74] *Id.* at -402.

[75] DX 24; *see* Ogus Dep. Tr. 172-73, 322; Bloom Dep. Tr. 582.

SportTechie "ha[d] the ability to unilaterally repurchase all of [Ogus's] shares, per Section 6 of the Shareholders Agreement" but "would prefer not to do that."[76] The letter included an offer to allow Ogus to retain a 5% interest in SportTechie in exchange for his agreement to sell back the remainder of his stock based on an enterprise valuation of $2.2 million.[77] Ogus rejected the offer.

On May 9, SportTechie repurchased Ogus's 2,447,500 shares of common stock under a Purchase Agreement between SportTechie and Ogus.[78] Bloom signed the Purchase Agreement on Ogus's behalf based on the power of attorney Ogus had granted to SportTechie in Section 6.4(e) of the Shareholders Agreement.[79] The Purchase Agreement stated that the $819,951.35 aggregate purchase price was based on a $2.2 million enterprise value for SportTechie, which was "determined pursuant to a third party valuation."[80]

Kaufman forwarded Ogus the executed Purchase Agreement, a certified check for $82,000 (roughly 10% of the purchase price), and a promissory note issued by

---

[76] DX 24.

[77] *Id.*

[78] DX 25 at -936.

[79] *Id.* at -946.

[80] *Id.*

16

SportTechie for the balance of $737,951.35 (90% of the purchase price).[81] Ogus did not accept the payment.[82]

### F. Bodie Resigns

On August 27, 2018, Bodie voluntarily resigned from the Board.[83] She resigned following the receipt of communications from Ogus, whom she had never met and had only spoken to once during an introductory group teleconference in the fall of 2016.[84]

### G. The Litigation

On November 30, 2018, Ogus filed a Verified Complaint in this court against SportTechie, Bloom, Kaufman, Bodie, and Oak View Group.[85] In response to a motion to dismiss, Ogus filed an Amended Verified Complaint (the "Amended Complaint") advancing ten causes of action against different combinations of the same defendants.[86]

---

[81] *Id.* at -935, -947–49; *see* Bloom & Kaufman Answer ¶ 103.

[82] Second Am. Compl. ¶ 103.

[83] DX 30.

[84] *See* Bodie Dep. Tr. 57, 72, 82, 143-44, 149-50; Ogus Dep. Tr. 90, 270-71.

[85] Dkt. 1.

[86] Am. Verified Compl. (Dkt. 30) ("Am. Compl.").

The defendants moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6). In connection with briefing and argument on the motion to dismiss, Ogus voluntarily withdrew three of his claims.[87]

On January 31, 2020, Chancellor Bouchard issued a memorandum opinion granting the motion to dismiss the Amended Complaint in part.[88] Five of the surviving claims remain for disposition: Counts I, III, IV, V, and VI. The court's ruling on the motion to dismiss narrowed and refined the scope of those claims.

Count I is a claim for fraud against defendants Bloom and Kaufman.[89] It survived the motion to dismiss "with respect to the aspects of Count I asserting a claim for fraud in the inducement against Bloom and Kaufman for allegedly making misrepresentations and omissions of material [] facts in order to induce Plaintiff to (i) agree to converting SportTechie from an LLC to a corporation, and (ii) agree to create and later expand the Board, which excluded Plaintiff."[90]

Count III is a breach of fiduciary duty claim against Kaufman.[91] It was sustained insofar as Ogus alleged "that Kaufman breached his fiduciary duties by

---

[87] *See* Order Implementing the Court's Jan. 31, 2020 Mem. Op. (Dkt. 74) ("MTD Order") ¶¶ 8, 10; Dkt. 43 at 57 n.11; Dkt. 59 at 5. Other claims that remained were later withdrawn by Ogus—specifically, Counts VII, VIII, and X. *See* Dkt. 179 ¶¶ 186-11, 224-32.

[88] Mem. Op. (Dkt. 66) ("MTD Mem. Op.").

[89] *See* Am. Comp. ¶¶ 105-29; *see also* Second Am. Comp. ¶¶ 106-30.

[90] MTD Order ¶ 2.

[91] *See* Am. Compl. ¶¶ 147-53; *see also* Second Am. Comp. ¶¶ 148-54.

making misrepresentations and omitting material facts when asking Plaintiff to sign documents approving (i) the conversion of SportTechie from an LLC to a corporation and (ii) the creation of, and appointment of directors to, the Board."[92]

Count IV is a claim for breach of fiduciary duty against Bodie, Kaufman, and Bloom.[93] It survived the motion to dismiss regarding allegations that "Bloom withheld information from Plaintiff with respect to Plaintiff's approval of the conversion and his approval of the creation of, and appointment of directors to, the Board."[94] It also was deemed viable "as to the aspect of Count IV asserting that Defendants Bloom and Bodie breached their fiduciary duties to Plaintiff by signing the consent to terminate Plaintiff."[95]

Count V is a claim asserting that Oak View Group aided and abetted a breach of fiduciary duty.[96] The claim survived the motion to dismiss only with regard to allegations "that Oak View aided and abetted Defendant Bodie's alleged breach of fiduciary duty through her signing the consent to terminate Plaintiff."[97]

---

[92] MTD Order ¶ 4.

[93] *See* Am. Compl. ¶¶ 154-60 (naming Bodie and Bloom); *see also* Second Am. Comp. ¶¶ 155-61 (naming Bloom, Kaufman, Bodie, and Sato).

[94] MTD Order ¶ 5. Kaufman was later named as a defendant in Count IV. *See* Second Am. Compl. ¶¶ 157-58.

[95] MTD Order ¶ 5.

[96] *See* Am. Compl. ¶¶ 161-75; *see also* Second Am. Compl. ¶¶ 162-76.

[97] MTD Order ¶ 6.

Count VI is a claim for civil conspiracy against Bodie, Bloom, Kaufman, and Oak View Group.[98] The motion to dismiss this claim was denied.[99]

On October 7, 2021, SportTechie filed a petition in the United States Bankruptcy Court for the District of Delaware under subchapter V of chapter 11 of the United States Bankruptcy Code.[100] The next day, SportTechie filed a notice in this court of an automatic stay.[101] The automatic stay included Ogus's only remaining claim against SportTechie in Count IX. After the bankruptcy case was dismissed on January 12, 2022, the automatic stay ended.[102] The parties later stipulated to a voluntary dismissal with prejudice of all claims alleged against SportTechie on March 31, 2022.[103]

On January 24, 2022, Ogus moved for leave to file a second amended complaint in this action. He sought to amend his pleading to name Sato as a defendant and to replead Count IV due to SportTechie's bankruptcy.[104] Ogus acknowledged that the breach of fiduciary duty claim in Count IV had been dismissed to the extent it was premised on the Shareholders Agreement. He argued

---

[98] *See* Am. Compl. ¶¶ 176-84; *see also* Second Am. Compl. ¶¶ 177-85.

[99] MTD Order ¶ 7.

[100] DX 31.

[101] Dkt. 128; Dkt. 133.

[102] DX 36; *see* 11 U.S.C. § 362(c)(2)(B).

[103] *See* Dkt. 183.

[104] Dkt. 153 at 2-4.

20

that repleading was appropriate because SportTechie lacked assets to pay him if it were found liable for breach of contract.[105]

On March 9, Ogus's motion to amend was granted "[i]n light of the [defendants'] lack of opposition" to the motion.[106] The Second Amended Complaint was filed on March 11. On June 30, the court granted Sato's motion to dismiss the claims against him as time barred.[107]

On June 15, the remaining defendants submitted letters requesting leave to file motions for summary judgment.[108] Ogus opposed the requests.[109] After the requests for leave were granted, Bodie and Oak View Group moved for summary judgment on the claims against them.[110] Bloom and Kaufman filed a separate motion for summary judgment.[111]

On November 1, the court heard oral argument on the summary judgment motions.[112] A controversy then arose with respect to the plaintiff's failure to

---

[105] *Id.*

[106] Dkt. 170.

[107] *See* Dkt. 223; Dkt. 235 at 59-60.

[108] Dkts. 207-08.

[109] Dkts. 212-13.

[110] Dkt. 236.

[111] Dkt. 240.

[112] Dkts. 268, 270.

21

properly identify exhibits and attempt to introduce additional exhibits.[113] After much ado, the plaintiff submitted a final, complete set of exhibits on December 15. The matter was taken under advisement at that time.

## II. LEGAL ANALYSIS

Summary judgment should be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[114] The movants "have the initial burden of 'demonstrating the absence of a material factual dispute.'"[115] If the movants meet their burden, "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[116] "Summary judgment is 'inappropriate' if a rational trier of fact could find any determinative fact in favor of the non-moving party."[117] But the "mere existence of a scintilla of evidence in support of the [nonmovant's] position is not sufficient."[118]

---

[113] Dkts. 269-75.

[114] Ct. Ch. R. 56(c).

[115] *In re BGC P'rs, Inc. Deriv. Litig.*, 2021 WL 4271788, at *5 (Del. Ch. Sept. 20, 2021) (quoting *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008)).

[116] *Transkaryotic*, 954 A.2d at 356.

[117] *BGC P'rs*, 2021 WL 4271788, at *5 (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002)).

[118] *Haft v. Haft*, 671 A.2d 413, 419 (Del. Ch. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

At the summary judgment stage, "the court will not weigh evidence" or resolve competing inferences.[119] Still, the nonmovant cannot defeat a motion for summary judgment by asking the court to draw inferences "based on surmise, speculation, conjecture, or guess, or on imagination or supposition."[120] The non-movant also cannot "use mere assertions or denials to create inferences against the movant."[121] "[I]f the moving party supports its summary judgment motion with sufficient undisputed evidence and points to the absence of proof corroborating the nonmoving party's claims, the court properly grants the summary judgment motion."[122]

Guided by these standards, I begin by considering the remaining claims against Bodie and Oak View Group. I conclude that their motion for summary judgment should be granted. I next consider the summary judgment motion brought by Bloom and Kaufman. Because genuine issues of material fact remain, their motion is denied.

---

[119] *BGC P'rs*, 2021 WL 4271788, at *5 (citing *Cerberus Int'l*, 794 A.2d at 1150).

[120] *In re Asbestos Litig.*, 155 A.3d 1284, 2017 WL 510463, at *1 n.2 (Del. 2017) (TABLE).

[121] *In re Answers Corp. S'holders Litig.*, 2014 WL 463163, at *10 (Del. Ch. Feb. 3, 2014).

[122] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *6 (Del. Ch. May 22, 2000).

A. **Claims Against Bodie and Oak View Group**

Two claims remain against each of Bodie and Oak View Group. Bodie faces a breach of fiduciary duty claim (Count IV),[123] and Oak View Group is alleged to have acted as an aider and abettor (Count V).[124] Both Bodie and Oak View Group are named in a civil conspiracy claim (Count VI).[125] Judgment is granted in Bodie and Oak View Group's favor on all.

1. Breach of Fiduciary Duty

For a breach of fiduciary duty claim to survive a motion for summary judgment, there must be a genuine issue of material fact as to whether the defendant director faces a non-exculpated claim.[126] If a director faces only an exculpated claim for breach of fiduciary duty, summary judgment is appropriately granted.[127]

8 *Del. C.* § 102(b)(7) "permit[s] stockholders to adopt a provision in the certificate of incorporation to free directors of personal liability for damages for due care violations, but not duty of loyalty violations, bad faith claims and certain other

---

[123] Second Am. Compl. ¶¶ 155-61.

[124] *Id.* ¶¶ 162-76.

[125] *Id.* ¶¶ 177-85.

[126] *See BGC P'rs*, 2021 WL 4271788, at *9.

[127] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1176 (Del. 2015) (explaining that "[w]hen the independent directors are protected by an exculpatory charter provision and the plaintiffs are unable to plead a non-exculpated claim against them, those directors are entitled to have the claims against them dismissed").

24

conduct."[128] SportTechie's certificate of incorporation includes a provision that exculpates directors "[t]o the fullest extent permitted by law."[129] Thus, to the extent Bodie breached a duty of care—that is, by acting negligently or even with gross negligence—she cannot be held liable.[130]

Ogus initially alleged that Bodie breached her fiduciary duties by: (1) withholding information from Ogus; (2) signing the consent ending Ogus's employment; and (3) repurchasing Ogus's stock.[131] This claim was dismissed to the extent it was based on allegations that Bodie withheld information from Ogus or authorized SportTechie's repurchase at less than fair value.[132] Only the second aspect of the claim is left for adjudication. Thus, the issue before this court is whether Bodie faces a non-exculpated claim for breaching her fiduciary duties by signing the written consent that removed Ogus as an officer and authorized his termination.

Ogus strives to broaden that claim to include the repurchase of Ogus's stock in May 2017, which he calls a "freeze out" or a "squeeze out."[133] But his effort to

---

[128] *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001).

[129] *See* DX 3 Arts. IX & XII.

[130] *See McPadden v. Sidhu*, 964 A.2d 1262, 1273 (Del. Ch. 2008).

[131] Am. Compl. ¶¶ 156-58; Second Am. Compl. ¶¶ 157-59.

[132] MTD Mem. Op. 25, 29-30.

[133] Pl. Simon Ogus's Br. in Opp'n to Defs.' Mots. for Summ. J. (Dkt. 244) ("Pl.'s Answering Br.") 1, 5, 30, 33-34; *see also id.* at 43 (arguing that "the termination of Ogus

25

bootstrap allegations about the stock repurchase into the narrow remaining claim fails. Chancellor Bouchard dismissed the repurchase-related aspects of Ogus's claims because they were "squarely addressed" by the Shareholders Agreement.[134] In doing so, he expressly held that the Shareholders Agreement foreclosed a breach of fiduciary duty claim against Bodie based on "whether Ogus received fair value for his shares."[135]  That is the law of the case.

Ogus argues that the termination of his employment and repurchase of his stock are an "[i]ntegrat[ed] [t]ransaction."[136]  Even if the law of the case doctrine did not preclude relitigating Ogus's contention,[137] these occurrences must be considered individually.  Under Delaware law, discrete actions can be viewed as a single transaction in limited cases where the evidence shows that they were planned and carried out in unison, suggesting "a conscious plan to achieve a particular

and the buyout of his stock should be viewed as one transaction"); *infra* note 211 (addressing this argument by Ogus).

[134] MTD Mem. Op. 29; *see* MTD Order ¶ 5.

[135] MTD Mem. Op. 29.  As discussed below, the repurchase remains relevant as a potential motivation for Ogus's firing.  But that theory is wholly unsupported by the record as to Bodie.  *See infra* notes 171-73 and accompanying text.

[136] Pl.'s Answering Br. 42.

[137] *See Del. Dept. of Nat. Res. and Env't Control v. Food & Water Watch*, 246 A.3d 1134, 1139 (Del. 2021) (explaining that the law of the case doctrine "applies to decisions rendered by a court that arise again later in the same court, in the same proceeding" (quoting *Frederick-Conaway v. Baird*, 159 A.3d 285, 296 (Del. 2017))).

endpoint."[138] The record here, however, demonstrates that the termination and repurchase were two distinct acts, taken months apart by different actors.

The SportTechie Board—including Bodie—decided to remove Ogus and terminate his employment in March 2017.[139] Two months later, Bloom caused SportTechie to exercise the right to repurchase Ogus's stock under the Shareholders Agreement.[140] There is no evidence that Bodie participated in a Board decision to cause SportTechie to exercise its repurchase right.[141] Further, the repurchase price was based on the work of Derivatas, which was indisputably retained by Bloom and Kaufman without Bodie's knowledge or involvement.[142]

Ogus further argues that "[t]he fact that the breach of fiduciary duty claim as to Bodie was dismissed based on a breach of a provision to the Shareholders Agreement does not eliminate the claim based on the termination of Ogus or under the common law."[143] But at the pleading stage, the court dismissed Ogus's breach

---

[138] *Liberty Media Corp. v. Bank of N.Y. Mellon Tr. Co.*, 2011 WL 1632333, at *18 (Del. Ch. Apr. 29, 2011), *aff'd*, 29 A.3d 225 (Del. 2011).

[139] DX 22.

[140] DX 25.

[141] Bodie was not required to authorize SportTechie's decision to repurchase Ogus's shares. *See In re The Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 773 (Del. Ch. 2005) ("[I]f the directors [are] under no duty to act, then they c[an] not have acted in bad faith by not acting."), *aff'd*, 906 A.2d 27 (Del. 2006).

[142] *See* Bodie Dep. Tr. 123.

[143] Pl.'s Answering Br. 5.

of fiduciary duty claim against Bodie concerning SportTechie's repurchase of his stock.[144] That claim is the common law breach of fiduciary duty on which Ogus now seeks a trial.

Ogus could have pursued his breach of contract claim based on the repurchase against SportTechie after the automatic stay in connection with the bankruptcy proceeding ended. He opted not to and stipulated to SportTechie's dismissal with prejudice. He cannot now attempt to revive a claim based on SportTechie's exercise of a contractual right to repurchase Ogus's stock in the event of his termination—a right that existed before Bodie joined the Board. Instead, Ogus is limited to proceeding on his theory relating to Bodie's approval of his termination and removal.

### a. Bodie Is Presumed to Have Acted in Good Faith.

Delaware's default standard of review is the business judgment rule, which "is a presumption that in making a business decision, the board of directors 'acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company.'"[145] This principle "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs

---

[144] *See* MTD Mem. Op. 30.

[145] *Solomon v. Armstrong*, 747 A.2d 1098, 1111 (Del. Ch. 1999) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE); *see also Walt Disney Co.*, 906 A.2d at 52.

of the corporation."[146] If the presumption attaches, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[147]

Bodie's decision to sign the written consent approving the removal of Ogus as a SportTechie officer and authorizing the termination of his employment was a classic exercise of business judgment.[148] The presumption that Bodie acted in good faith attaches to this decision.[149] The Board's authority to remove and terminate Ogus derived from SportTechie's certificate of incorporation and bylaws, along with its general authority to manage the business and affairs of SportTechie.[150]

Bodie's agreement to support Ogus's removal was "one logical approach to advancing [SportTechie]'s objectives."[151] The record demonstrates that Bodie

---

[146] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009).

[147] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

[148] *See generally Walt Disney Co.*, 907 A.2d at 760-80 (discussing the hiring and termination of a corporate officer as a matter of business judgment when conducted in good faith); *Shabbouei v. Potdevin*, 2020 WL 1609177, at *12 (Del. Ch. Apr. 2, 2020) (explaining that a board operated "well-within the bounds of proper business judgment" in deciding to settle with an executive rather than terminating him "for cause").

[149] *See Carlson v. Hallinan*, 925 A.2d 506, 540 (Del. Ch. 2006) ("The decision to remove an officer is a business judgment to which the presumptions of the business judgment rule attach.").

[150] *See* MTD Mem. Op. 15.

[151] *Dollar Thrifty*, 14 A.3d 573, 598 (Del. Ch. 2010) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose.")).

signed the written consent terminating Ogus after Bloom reported that Ogus's removal was a "top priority" for SportTechie.[152] Bloom told Bodie that Ogus had been a "weak link[] . . . for some time" and was "an unreliable team member" who had "failed to scale with SportTechie's growing needs."[153] In response, Bodie told Bloom that she was "totally supportive of [his] judgment and call" on the matter.[154]

Ogus attempts to upend the application of the business judgment rule by contending that entire fairness—Delaware's most stringent standard of review—applies to this claim.[155] The court's motion to dismiss decision did not conclude that entire fairness would apply. In fact, Ogus failed to raise this argument until summary judgment.[156]

Regardless, Ogus's position is meritless. Oak View Group was not (as Ogus argues) a controlling stockholder of SportTechie; Bloom was SportTechie's majority

---

[152] DX 21.

[153] *Id.*; *see* Bodie Dep. Tr. 114, 123.

[154] DX 21; *see* Bodie Dep. Tr. 114; *see also* DX 37 ¶ 55 (Ogus noting: "I never spoke to [Bodie] in any setting besides one 7-person conference call. [Bodie] based her decision to terminate solely based on discussions with [Bloom] and [Kaufman]").

[155] Ogus never specifies the transaction to which he believes entire fairness applies—that is, the termination, the repurchase, or some combination of the two. Given that only the termination remains relevant for the claim against Bodie, I assume in this section that Ogus is arguing that entire fairness applies to the termination decision. *See infra* note 211 and accompanying text (discussing this argument as to Bloom).

[156] A significant portion of Ogus's answering brief details his view that the Derivatas report is flawed, creating an issue of fact about fair price under an entire fairness analysis. *See* Pl.'s Answering Br. 43-61.

stockholder.[157]  Neither Oak View Group nor Bodie held SportTechie shares.[158]  If

that were not enough, there is no evidence that Oak View Group or Bodie dominated

SportTechie's Board.[159]  Oak View Group had one seat out of three.  Further, Oak

View Group did not "stand on both sides of the transaction."[160]  Nothing in the record

suggests that Oak View Group (or Bodie) exerted control over or even benefitted

from the repurchase.

                b.      There Is No Evidence That Bodie Acted in Bad Faith.

The business judgment rule's presumption may be rebutted with evidence that

Bodie acted in bad faith.[161]  "Bad faith is 'not simply bad judgment or negligence,'

---

[157] *Id.* at 32-37.

[158] According to Ogus, Oak View Group's note entitled it to about 14.4% of the equity. *See id.* at 33.  That conversion right was never triggered.  *See supra* note 29.

[159] *See Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *16 (Del. Ch. May 31, 2017) (explaining that the "actual control test is 'not an easy one to satisfy'" and the plaintiff must show evidence that stockholders "have such formidable voting and managerial power that they are, as a practical matter, no differently situated than if they had majority control" (quoting *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006))).

[160] Pl.'s Answering Br. 32-37.

[161] *See Walt Disney Co.*, 906 A.2d at 62-64 (explaining that the presumption of good faith can be rebutted with evidence that a director was "motivated by an actual intent to cause harm" or evidence of an "intentional dereliction of duty").  There is no indication that Bodie "acted to advance the self-interest of an interested party from whom [she] could not be presumed to act independently."  *BGC P'rs*, 2021 WL 4271788, at *9 (quoting *Cornerstone*, 115 A.3d at 1179-80).  Ogus's brief makes a broad statement that Bodie and Bloom "each were self-interested or were not independent of others who were self-interested."  Pl.'s Answering Br. 30.  Who Bodie purportedly lacked independence from, however, is not addressed.  There is no argument—much less evidence—suggesting that Bodie lacked independence from Bloom.  To the extent that Ogus is attempting to argue

31

but rather 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.'"[162] "[I]t contemplates a state of mind affirmatively operating with furtive design or ill will."[163]

Chancellor Bouchard held that it was reasonable to infer at the pleadings stage that Bodie agreed to "terminate[] Ogus's employment in bad faith simply to eliminate his ownership position in the company for unfair value."[164] Now, at the summary judgment stage, Ogus must adduce evidence demonstrating the existence of a genuine issue of material fact as to whether Bodie's vote to remove Ogus as an officer and terminate his employment was made in bad faith.[165] He has not.

The record lacks any evidence supporting a rational inference that Bodie's support of Bloom's decision to terminate Ogus was "egregious" or "irrational."[166] Nor is there any evidence that Bodie acted with an intent to cause Ogus harm.[167]

---

that Bodie was self-interested, that argument is also without support in the record. *See infra* notes 171-73 and accompanying text.

[162] *McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del. Ch. 2004) (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Fund, II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993)).

[163] *Id.*

[164] MTD Mem. Op. 27-28.

[165] *See In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 487-88 (Del. Ch. 2000).

[166] *See White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001).

[167] *See McGowan*, 859 A.2d at 1036; *Walt Disney Co.*, 906 A.2d at 62-64 (describing that the presumption of good faith may be rebutted with evidence that a director was "motivated by an actual intent to cause harm").

Bodie never met Ogus and spoke to him just once during a group call.[168] In fact, Ogus testified in his deposition that he does not know why Bodie authorized his removal and termination.[169] The only relevant evidence indicates that Bodie acted out of deference to Bloom's judgment by signing the written consent terminating and removing Ogus.[170]

Ogus argues that Bodie was motivated to terminate him because she stood to benefit from SportTechie's subsequent repurchase of his shares under the Shareholders Agreement.[171] He cannot, however, point to any evidence that Bodie (or Oak View Group) was motivated out of a desire to repurchase his equity. Bodie testified otherwise.[172] SportTechie—not Oak View Group—purchased Ogus's stock. Neither Oak View Group nor Bodie received any consideration in the repurchase. Counterfactual speculation about Oak View Group's ability to obtain

---

[168] *See supra* note 84 and accompanying text.

[169] Ogus Dep. Tr. 322, 326-27.

[170] DX 21; *see* Bodie Dep. Tr. 56-57, 107-09, 114.

[171] *See* Pl.'s Answering Br. 33. The specific allegation that survived a motion to dismiss was that Bodie acted in bad faith when she signed the consent removing and terminating Ogus. I consider Bodie's potential conflict for the sake of completeness.

[172] *See* Bodie Dep. Tr. 125-26. Ogus testified that he believes Bodie failed in her "fiduciary duty to buy [his] shares at fair market value." Ogus Dep. Tr. 327. This belief is without evidentiary or legal support. It is also irrelevant, as the repurchase-related claim was dismissed.

Ogus's shares cannot sustain a breach of fiduciary duty claim at the summary judgment stage.[173]

Lacking evidence of bad faith or self-interest, Ogus avers that Bodie "abdicate[d] [her] duty to manage the corporation" in connection with the termination decision.[174] It is not apparent that this theory of liability was pleaded.[175] If it were, it lacks factual support. Rather, the record shows that Bodie—who had been on the Board for one month—accepted Bloom's recommendation after she was told that Ogus was an "unreliable team member."[176] A "failure to be informed of all facts material to [a] decision" does not amount to bad faith.[177]

---

[173] *Chen v. Howard-Anderson*, 87 A.3d 648, 685 (Del. Ch. 2014) (explaining that "speculation about motives" is insufficient grounds to support a breach of fiduciary duty claim at the summary judgment stage); *see In re Novell, Inc. S'holder Litig.*, 2014 WL 6686785, at *9 (Del. Ch. Nov. 25, 2014) (granting summary judgment where the "plaintiffs ha[d] not supplied a factual basis for concluding that the Board acted with improper motives").

[174] Pl.'s Answering Br. 64-65.

[175] *Cf.* Second Am. Compl. ¶¶ 4, 6, 10, 43, 44, 221. Ogus did not plead a duty of care claim against Bodie. Only the loyalty claim regarding the termination of Ogus survived the motion to dismiss the Amended Complaint.

[176] DX 21; *see* Bodie Dep. Tr. 114 ("As [Bloom] [w]as CEO, I trusted his judgment to lead the company and if that was his . . . interpretation of personnel issues, then I supported him.").

[177] *See Walt Disney Co.*, 906 A.2d at 66; *see also Chen*, 87 A.3d at 683 ("As long as a board attempts to meet its duties, no matter how incompetently, the directors did not consciously disregard their obligations."). Setting aside the lack of a care claim in the Complaint and the exculpatory provision in SportTechie's charter, the record does not indicate that Bodie was grossly negligent. The only relevant evidence demonstrates that Bodie received and reviewed information from Bloom—who was much closer to SportTechie's personnel issues as CEO—and made a reasonable decision to support his recommendation. *See supra* note 170 and accompanying text. *See also Albert v. Alex*

At bottom, Ogus disagrees with Bodie's decision to remove him from SportTechie.[178] But "mere disagreement" does not rebut the presumption that Bodie made the decision to terminate Ogus in good faith and it "cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty."[179] Summary judgment is therefore granted in Bodie's favor on Count IV.

### 2. Aiding and Abetting

To succeed on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must demonstrate "(1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach."[180] An aiding and abetting claim

---

*Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate . . . law, one 'which involves a devil-may-care attitude or indifference amounting to recklessness.'" (internal citation omitted)).

[178] There is a more troubling undercurrent in the record regarding Ogus's decision to sue Bodie and Oak View Group. After his termination, Ogus researched Bodie and her family, discussing Bodie's personal information with his own friends and family. For example, Ogus and a friend celebrated locating Bodie's home address. Ogus emailed: "BOOM!" and considered the details of its ownership. DX 27 (Ogus: "Damn its [sic] owned by some company that Francesca owns. Wonder how that could change things."). Ogus essentially acknowledged as much in his answering brief. *See* Pl.'s Answering Br. 24 (explaining that "it became apparent to Ogus that OVG had to become involved [if] they were going to settle").

[179] *Brehm v. Eisner*, 746 A.2d 244, 266 (Del. 2000).

[180] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014).

"may be summarily dismissed based upon the failure of the breach of fiduciary duty claims."[181]

At the pleading stage, the court determined that Ogus adequately alleged that Bodie's knowledge of and participation in Ogus's termination could be imputed to Oak View Group.[182] As explained above, however, there is no genuine issue of material fact precluding summary judgment in Bodie's favor on the breach of fiduciary duty claim. Without a predicate breach, the aiding and abetting claim fails.[183]

Moreover, Ogus did not address the aiding and abetting claim in his answering brief.[184] He makes a single statement in the introduction to his brief that "Bodie can still be found responsible for breaching her duty of care and, as noted in Chancellor Bouchard's [motion to dismiss decision], OVG would be liable for Bodie's breach."[185] But the motion to dismiss decision says no such thing, which is unsurprising since Ogus did not plead a duty of care claim against Bodie.

---

[181] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1003 (Del. Ch. 2014) (quoting *Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *2 (Del. Ch. Jan. 17, 1991)).

[182] MTD Mem. Op. 32.

[183] *See Transkaryotic*, 954 A.2d. at 371; *Zimmerman v. Crothall*, 2012 WL 707238, at *19 (Del. Ch. Mar. 5, 2012).

[184] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[185] Pl.'s Answering Br. 3.

### 3. Civil Conspiracy

"Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong."[186] A plaintiff alleging civil conspiracy must also prove "knowing participation" among the conspiring partners "for an unlawful purpose, or . . . by unlawful means."[187] This requires a "meeting of the minds" about the object or purpose of the conspiracy.[188]

Ogus's civil conspiracy claim is based on allegations of a plan by the defendants "to cause [Ogus] . . . to be terminated and forced to sell his equity interest at a price far below fair market value."[189] The motion to dismiss opinion noted that Ogus had "satisfied the hurdle" of pleading the elements of a conspiracy based on the procedural posture of the motion, "albeit not overwhelmingly."[190] Now, as to Bodie and Oak View Group, he has come up short. Because summary judgment is

---

[186] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009); *see McKenna v. Singer*, 2017 WL 3500241, at *20 (Del. Ch. July 31, 2017) ("To prove civil conspiracy, the following elements are required, '(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.'" (quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006))).

[187] *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *11 (Del. Ch. Apr. 29, 2010) (internal quotation omitted).

[188] *See Matthew v. Laudamiel*, 2012 WL 605589, at *13 (Del. Ch. Feb. 21, 2012).

[189] Second Am. Compl. ¶¶ 2, 180-85; *see* Ogus Dep. Tr. 340 (observing that the purpose of the conspiracy was "to . . . undergo a number of company events and eventually purchase my shares").

[190] MTD Mem. Op. 34-35 n.109.

granted on the underlying breach of fiduciary duty claim against Bodie and the dependent aiding and abetting claim against Oak View Group, these defendants are also entitled to judgment in their favor on the civil conspiracy claim.[191]

In addition, there is no genuine issue of material fact as to whether Bodie or Oak View Group conspired with another defendant to "force [Ogus] to sell his equity interest at a price far below fair market value."[192] There is no evidence that Bodie or Oak View Group: (1) played a role in retaining Derivatas; (2) received or reviewed the Derivatas valuation report before the termination decision or repurchase; (3) knew the repurchase price before the termination decision; (4) were

---

[191] *See Naples v. New Castle Cnty*., 2015 WL 1478206, at *15 (Del. Super. Ct. Mar. 30, 2015) (granting summary judgment because the claims underlying a civil conspiracy claim "lack[ed] evidentiary support"); *see also Wright v. Experian Info. Sols*., 2016 WL 6634864, at *2 (D. Del. Nov. 7, 2016) (granting summary judgment because the plaintiff "[could not] establish the underlying conduct necessary to prove civil conspiracy"). Summary judgment is appropriate even though—as discussed below—predicate claims against Bloom and Kaufman will proceed to trial. "To maintain a civil conspiracy claim, the plaintiff must allege an underlying actionable tort by each defendant." *Abbott v. Gordon*, 2008 WL 821522, at *17 (Del. Super. Ct. Mar. 27, 2008), *aff'd*, 957 A.2d 1 (Del. 2008); *see RBATHDSR, LLC v. Project 64 LLC*, 2020 WL 2748027, at *7 (D. Del. May 27, 2020) (same); *Smiley v. Daimler Chrysler*, 538 F. Supp. 2d 711, 718 (D. Del. 2008) (same); *see also AJZN, Inc. v. Yu*, 2015 WL 331937, at *11 (D. Del. Jan. 26, 2015) (dismissing a civil conspiracy claim because the underlying wrong could "only be alleged against a single defendant").

[192] Second Am. Compl. ¶ 2. The court previously sustained Ogus's conspiracy claim against Bodie and Oak View Group based on allegations that they participated in a complex plan culminating with the repurchase. MTD Mem. Op. 34. The unrefuted evidence, however, shows that Oak View Group did not invest in SportTechie with an intent to acquire it. Discovery from Oak View Group turned up zero internal discussions about acquiring SportTechie. And Oak View Group never became a SportTechie stockholder. *See* Bodie Dep. Tr. 121.

38

aware that the repurchase had been effected until after the fact; or (5) had an understanding or view of the fair market value of Ogus's SportTechie stock at the time of the termination decision or repurchase.[193] Ogus concedes that Bodie and Oak View Group were not involved in the conversion of SportTechie LLC to a corporation, did not exclude Ogus from the Board, did not have any input in the Shareholders Agreement, and did not cause SportTechie to repurchase Ogus's stock.[194]

Ogus contends that a conspiracy is apparent because emails between Oak View Group and SportTechie personnel excluded him.[195] That Ogus was not copied on all email correspondence with Oak View Group does not support a reasonable

---

[193] *See* Bodie Dep. Tr. 86-87, 95-96, 107, 123-24; Kaufman Dep. Tr. 162, 164; Ogus Dep. Tr. 335; Bloom Dep. Tr. 506, 508.

[194] *See* Pl.'s Answering Br. 84. Bloom authorized the corporate conversion before Bodie was appointed to the Board. *See* DX 3; DX 17. Other than negotiating a contractual right to a Board seat, Oak View Group and Bodie were not involved in creating SportTechie's Board. Rather, Ogus and Bloom appointed Sato and Bodie to the Board. *See* DX 17. Ogus admitted that neither Bodie nor Oak View Group ever promised him a Board seat or even spoke to him about joining the Board. *See* Ogus Dep. Tr. 351. There is also no evidence that Bodie or anyone from Oak View Group played a role in the Shareholders Agreement. *See* Ogus Dep. Tr. 355; Kaufman Dep. Tr. 162; Bodie Dep. Tr. 87.

[195] Pl.'s Answering Br. 81 ("This is not an accident. When people write emails they make a conscious decision of who it is addressed to and who is copied.").

inference that the alleged conspirators "all agreed that [Ogus] should not be copied on any communications to and from OVG prior to his termination."[196]

The only other evidence Ogus cites concerns Bodie's general "aware[ness]" of a potential repurchase of Ogus's equity before his employment was terminated. Bodie's knowledge that SportTechie had a preexisting contractual right to repurchase Ogus's equity upon his termination does not, however, indicate that she voted to end Ogus's employment to "forc[e] [Ogus] to sell his equity interest"—let alone "at a price far below fair market value."[197]

Thus, insofar as the alleged conspiracy includes Bodie or Oak View Group, they are entitled to judgment as matter of law. The lack of a predicate claim alone is dispositive. Ogus also failed to offer any evidence of an issue of material fact regarding a conspiracy involving these defendants.

### B. Claims Against Bloom and Kaufman

Three claims remain against each of Bloom and Kaufman. Both defendants are named in a pending fraud claim (Count I), breach of fiduciary duty claims (Count III as to Kaufman and Count IV as to Bloom), and a civil conspiracy claim (Count VI). Like the claims against Bodie and Oak View Group, the fraud and

---

[196] *Id.* at 82; *see Asbestos Litig.*, 155 A.3d at 1284, 2017 WL 510463, at *1 n.2 ("The Court must decline to draw an inference for the non-moving party if the record is devoid of facts upon which the inference reasonably can be based." (internal quotations omitted)).

[197] Second Am. Compl. ¶ 2.

fiduciary duty claims against Bloom and Kaufman based on the Shareholders Agreement were previously dismissed.[198]

The similarities among the two defendant groups end there. Bloom and Kaufman—in stark contrast to Bodie and Oak View Group—were deeply involved in the relevant events that give rise to this litigation. Had only Kaufman and Bloom sought leave to move for summary judgment, their request would have been denied. "There is no 'right' to a summary judgment."[199]

---

[198] *See supra* note 137 (explaining that the law of the case doctrine bars the relitigation of these claims); *see also* MTD Mem. Op. 11, 15, 21, 28-30. That does not make the Shareholders Agreement entirely irrelevant to the remaining claims. The court explained in its motion to dismiss decision that Ogus had pleaded with particularity that Bloom and Kaufman could gain from their alleged fraudulent statements by "terminat[ing] Ogus's employment with the Company and, assuming Ogus later would sign the Shareholders Agreement, [forcing] him 'to sell his equity interest at a price far below fair market value.'" *Id.* at 13 (citing Am. Compl. ¶ 2). Regarding the breach of fiduciary duty claim, the court held that it was reasonably conceivable that Bloom "terminated Ogus's employment in bad faith simply to eliminate his ownership position in the Company for unfair value." *Id.* at 27-28. The question of whether Ogus had received fair value for his shares, however, could not "form the basis of a fiduciary duty claim" because it was "squarely addressed by the terms of the Shareholders Agreement." *Id.* at 29. Accordingly, the execution of the Shareholders Agreement—and the attendant circumstances surrounding it—is relevant to the defendants' alleged motivations in withholding information from and terminating Ogus. But whether Ogus ultimately received fair value for his shares is no longer before the court. *See id.* at 29-30 ("Insofar as the question is whether Ogus received fair value for his shares, however, that dispute is squarely addressed by the terms of the Shareholders Agreement—which has a built in requirement that the directors determine fair value in good faith—and cannot form the basis of a separate fiduciary duty claim under the reasoning of *Nemec*."). Ogus's recourse was to sue SportTechie for breach of the Shareholders Agreement. That claim was abandoned.

[199] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

Ogus argues that Bloom and Kaufman committed fraud by making "misrepresentations and omissions of material facts" that induced Ogus to "agree to converting SportTechie from an LLC to a corporation" and "agree to a five-person Board, initially comprised of Bloom, Sato, and Bodie."[200]  He believes that Bloom and Kaufman "fraudulently concealed the true reasons" motivating the conversion and exclusion of Ogus from the Board: the desire to terminate Ogus and repurchase his shares at a purportedly unfair price.[201]

Ogus's fiduciary duty claims are based on the same factual predicate.  Ogus alleges that Kaufman breached his fiduciary duties as a SportTechie officer by "pressur[ing] and threaten[ing] [Ogus] to cause [Ogus] to execute conversion and other key documents" and by misrepresenting material information about the

---

[200] Second Am. Compl. ¶ 108.  To establish a claim for fraud, a plaintiff must show "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages." *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[201] Second Am. Compl. ¶ 109.  Ogus argues that the restricted stock agreement Kaufman entered into the day after executing the Shareholders Agreement incentivized Kaufman to support Bloom's scheme. *Id.* ¶ 70.   The court previously held that it was "reasonably conceivable that Kaufman, motivated by obtaining a personal benefit if the alleged plan to eliminate Ogus was consummated, breached his fiduciary duty of loyalty by making threats against and bringing undue pressure on Ogus so that he would sign the documents to implement the critical first step of that plan." MTD Mem. Op. 22.  Resolving this matter requires a credibility assessment and an examination of the defendant's state of mind at trial.

conversion and Board composition.[202] Ogus alleges that Bloom breached his fiduciary duties by withholding critical information from Ogus about the conversion and by improperly terminating Ogus in bad faith while scheming to repurchase Ogus's equity at less than fair market value.[203]

Ogus's civil conspiracy claim against Bloom and Kaufman concerns these underlying acts.[204] Ogus maintains that Kaufman and Bloom acted in concert to deprive him of his job and SportTechie stock.

A factual record developed at trial is necessary to resolve the remaining claims against Bloom and Kaufman.[205] Ogus insists that he was promised a Board seat and was led to understand that he would retain post-conversion the level of influence he had over SportTechie LLC.[206] Ogus asked Bloom and Kaufman whether Bloom receiving a Board seat to Ogus's exclusion "[a]ffect[ed] [Ogus's] standing in any

---

[202] Second Am. Compl. ¶¶ 150-51.

[203] *Id.* ¶ 157.

[204] *Id.* ¶¶ 182-83.

[205] *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *9 (Del. Ch. June 12, 2014) ("When confronted with a Rule 56 motion, the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application.").

[206] *See* Ogus Dep. Tr. 197-98 (describing that he "believed that [he] was going to be added to the board" and "believe[d] that that was discussed with [both Bloom and Kaufman]"), 202-203 (stating his understanding that he would be retaining rights and his interest in the company but that he does not "recall specifically what [Kaufman] said to [him]"); DX 55 ¶ 32.

way" or created "potential vulnerabilities" and "expos[ure] for Ogus.[207] Although Ogus chose to sign documents that were unfavorable to him, he was given some assurance by Bloom and Kaufman that he would be protected.[208] Yet Ogus was never given a Board seat and was later stripped of his roles as an officer, employee, and stockholder at the company he founded.[209] A more thorough examination of the facts is needed to determine whether Ogus was simply naïve or was hoodwinked.

Bloom and Kaufman further aver that they are entitled to summary judgment on the fiduciary duty claims because there is no suggestion in the record that the purported plot to rid SportTechie of Ogus would have benefitted them.[210] Given that, they believe that their actions are protected by the business judgment rule.[211] At present, however, I cannot conclude that these defendants were not motivated by self-interest or "by an actual intent to do harm."[212]

---

[207] DX 11 (Ogus to Bloom and Kaufman: "[D]oes your name on the board over me or both of us taking 1 seat effect my standing in any way or potential vulnerabilities?").

[208] *See* PX 32.

[209] *See supra* notes 67-70 and accompanying text.

[210] Dkt. 240 at 24-25.

[211] *Id.* at 27. Once again, Ogus insists that the entire fairness standard of review applies to an unspecified transaction. No such pleading stage determination was made. Bloom was just one member of a three-member Board, and there is no genuine issue of material fact calling into question the independence and disinterestedness of Bodie and Sato. Again, Ogus's argument that this is a controller squeeze-out is misplaced. There was no merger and there are no allegations of a forced redemption by Bloom. Bloom was SportTechie's controlling stockholder, but he held the same 55.5% interest and status as CEO before and after SportTechie's repurchase. *See* DX 62 at -189; LLC Agreement Ex. A.

[212] *Walt Disney Co.*, 906 A.2d at 64.

Although Ogus's success after trial is far from assured, genuine issues of material fact remain that preclude an entry of summary judgment in Bloom and Kaufman's favor. Bloom and Kaufman's depiction of the relevant events is inconsistent with the story told by Ogus. "If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate."[213]

## III. CONCLUSION

For the reasons described above, Bodie and Oak View Group's motion for summary judgment is granted. Judgment is entered in Bodie's favor on Counts IV and VI. Judgment is entered in Oak View's favor on Counts V and VI. Kaufman and Bloom's motion for summary judgment is denied. Within ten business days, Ogus, Kaufman, and Bloom shall submit a proposed scheduling stipulation providing for a prompt trial.

---

[213] *Cerberus Int'l*, 794 A.2d at 1150; *Amirsaleh v. Bd. of Trade of the City of New York, Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) ("Where intent or state of mind is material to the claim at issue—as is the case here—summary judgment is not appropriate.").